UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| COLUMBIA BASIN AG MANAGEMENT LLC,<br><br>                Plaintiff,<br><br>     v.<br><br>DEL MONTE FOODS INC,<br><br>                Defendant. | No. 4:16-CV-05058-EFS<br><br>**ORDER MEMORIALIZING RULINGS** |

Before the Court are Plaintiff's Motion for Discovery Sanctions, ECF No. 18[1]; Defendant's Motion for Summary Judgment, ECF No. 20; and Plaintiff's Motion for Partial Summary Judgment, ECF No. 25. On June 27, 2017, the Court held a hearing in this matter and entered preliminary rulings on the majority of the issues raised by the parties' motions. *See* ECF No. 51. Then, on July 17, 2017, the Court held a telephonic hearing and ruled on the remaining issues. *See* ECF No. 59. This Order memorializes and supplements the Court's prior rulings.

## I.    GENERAL BACKGROUND AND FACTS[2]

Defendant Del Monte Foods, Inc. (Del Monte) has a facility in Toppenish, Washington that processes corn. Del Monte removes and

---

[1] The Court notes that in ECF No. 18, Plaintiff not only requests sanctions, but also requests that the Court compel production of certain discovery.
[2] Unless a different citation is provided, all stated facts are taken from the parties' Joint Statement of Uncontroverted Facts, ECF No. 46.

ORDER - 1

chops up the husks and cobs, which generally comprises roughly two-thirds of the mass of the harvested corn, resulting in Vegetable By-Product that can be sold as cattle feed.  This process creates wastewater due to water and cleaning chemicals that are used to wash down the plant.  Under informal permitting arrangements, Del Monte's vegetable process wastewater is collected and subjected to screening and dissolved air flotation (DAF), which removes organic materials and suspended solids.  Following screening and DAF, some process wastewater is conveyed to a lift station, from which it is pumped to a Del Monte-owned offsite farm field for spray application on grass-hay.

Plaintiff Columbia Basin Ag Management (CBAM) was founded in 2012 by Brandon Munn and Luke Dynes when Midvale Cattle Company, LLC (Midvale) offered Mr. Munn the opportunity to haul all of the Vegetable By-Product.  Under its purchase contract with Del Monte, Midvale paid $3.00 per raw ton of sweet corn delivered to the Toppenish plant in 2012.  CBAM hauled the Vegetable By-Product beginning in 2012.

In 2012, CBAM employee Mark Niederwerfer observed that Vegetable By-Product had matter "added" to it during processing.  He observed the starchy sweet corn material obtained through DAF being applied to the silage during processing, as well as sanitation persons daily by spraying water onto the silage with a garden hose.  The sanitation workers told Mr. Niederwerfer that, "They have to clean the screens." Mr. Niederwerfer told Mr. Munn about the DAF product in the silage. Those were the only places he recalled observing water or other

ORDER - 2

liquids being added to the silage after husking and chopping to comprise the Vegetable By-Product.

In early 2013, Mr. Munn and other prospective purchasers, including Midvale, were given the opportunity to bid on the contract for purchase, sale, and hauling of Del Monte Vegetable By-Product. Del Monte's field superintendent for the Toppenish plant has testified that the Vegetable By-Product hauled by CBAM in 2012 and prior years could be characterized as a "sample" of the Vegetable By-Product to be provided to the successful bidder in 2013, so that in his view, CBAM and other bidders "knew what they were getting." Del Monte and CBAM agreed on a price of $8.00 per ton of raw sweet corn delivered to the Toppenish plant each harvest season. Del Monte presented its written agreement for purchase, sale, and hauling of Vegetable By-Product, dated April 16, 2013 (the "Contract"), which was accepted by CBAM. There was no specific negotiation over any particular items under the Contract. Of relevance here, the Contract stated as follows:

> 4. As material consideration for this Agreement, Buyer agrees with Seller to promptly load said By-Product into trucks or other vehicles and promptly remove the By-Product from the Plant. In this connection, it is imperative to the operation of the Plant that Buyer furnishes trucks at intervals adequate in the opinion of Seller to remove said By-Product without delaying or otherwise hindering Seller's operation. The truck beds shall be of such construction so as to prevent liquids from the Vegetable By-Product from being discharged on any public roadway. Seller agrees to maintain choppers in order to keep breakdowns to a minimum. Seller further agrees to maintain proper supervision of the water screen at all times when By-Product is being generated in order to keep the screen from becoming clogged and to keep moisture to a minimum.
>
> 5. Buyer shall use, transport and dispose of the By-Product in compliance with all applicable laws. Buyer shall use the Vegetable By-Product to feed livestock only

ORDER - 3

and the parties mutually agree to the following. If, at any time this Agreement is in effect, the supply of By-Product or any part thereof is condemned by any state or federal government agency, as unfit for feeding livestock, then and in that event, Buyer shall not be required to purchase said By-Product or the part thereof which is condemned. Irrespective of the foregoing, Seller makes no warranty or representation that the By-Product is fit or suitable for any purpose or use and Buyer is buying the By-Product in "as is, where is" condition. Upon loading onto Buyer's truck, the By-Product shall become the property and responsibility of Buyer.

10. Buyer agrees to comply with all applicable laws, ordinances and regulations of any authority having jurisdiction over the hauling, use and disposal of Vegetable By-Product[.]

Mr. Dynes testified that throughout the 2013 and 2014 season, CBAM noticed a very large amount of free water in the Vegetable By-Product loads it received from Del Monte. CBAM complained to Del Monte about the quantity of water in Vegetable By-Product under the Contract at least every week. Mr. Munn pointed out to Del Monte's employee that water was pouring out of the trailers' drainage valves during loading. Del Monte employees represented to Mr. Munn that the parabolic screens employed in silage particulate collection were being cleaned regularly.

In 2013, the parties discussed the installation of a screw press to reduce the By-Product moisture level, but one was never installed. The parties discussed renegotiating the Contract, *see* ECF No. 24-2 at 11–14, but Del Monte ultimately terminated the Contract with CBAM on January 21 2015. At that time, Del Monte claimed CBAM owed $164,796.54 under the Contract, as well as $27,120.42 for damage caused by CBAM to Del Monte property during 2013. *See* ECF No. 24-2 at 14.

ORDER **-** 4

After CBAM was terminated, Del Monte engaged replacement hauler Ronald Yancey as an independent contractor under a contract containing the same screen maintenance language. In 2015, Mr. Yancey paid Del Monte $2.10 per ton of raw sweet corn delivered to the Toppenish plant, contrasted with the $8.00 per ton price paid by CBAM under the Contract. In 2016, Mr. Yancey renegotiated his contract with Del Monte to require it to pay him — rather than the other way around — at a rate of $9.80 per ton, plus a fuel surcharge. According to Mr. Yancey, the local market for feed started to become depressed in late 2015 and bottomed out in 2016.

Del Monte's Area Manager of the Toppenish facility formed a "continuous improvement group" of Toppenish employees, "that did the process flow to find places where we could reduce water flow and make changes to eliminate some of the water." The report included a summary that stated, "Corn silage transported from Toppenish contains unwanted water. Our current silage hauler (Yancey) has requested that we look at areas in our process where we can reduce water in our corn silage." The group identified six "Water Inputs — Root Causes" in its report, including, "Overflowing Parabolic Screen — Gets ignored, no cleaning schedule, not cleaned correctly." Other Root Causes included "Water in DAF sludge — Design of the DAF machine," and "Kobe Hoses Used on Huskers — Necessary to reduce silk build-up." Among the six potential solutions identified by the group as "Easy — High Payoff" (and, thus, recommended for implementation), was Item 2: "Train sanitation crew to clean the parabolic screens by removing the back doors and cleaning from the inside-out." Item 3 of the "Easy — High

Payoff" solutions was to "Establish a cleaning schedule by removing the back doors and cleaning from the inside-out."

On May 6, 2016, CBAM filed suit for breach of contract, alleging that Del Monte failed to keep moisture level of the By-Product to a minimum. *See* ECF No. 1 at 2. Plaintiff also claimed that Del Monte violated the Washington State Consumer Protection Act (CPA) by adding process water from its facility to the Vegetable By-Product, avoiding state and federal disposal regulations.[3] *See* ECF No. 1 at 2. Del Monte counterclaimed, alleging CBAM breached the Contract by failing to pay for all the By-Product that was delivered. Del Monte also included a counterclaim for damage allegedly caused by CBAM employees to the Toppenish facility in 2013 in connection with loading and hauling of the Vegetable By-Product.

## II.  **CBAM'S MOTION FOR SANCTIONS**

At the June 27, 2017 hearing, the Court heard arguments on CBAM's Motion for Discovery Sanctions, ECF No. 18, granting it in part, denying it in part, and reserving ruling in part. *See* ECF No. 51. The Court reserved ruling on those portions of CBAM's motion relating to video evidence, Locus Focus data, and replacement-hauler communications, so that the parties could confer and submit relevant filings. *See* ECF No. 51 at 2.

Del Monte submitted a declaration indicating that it had provided CBAM with all remaining video evidence. *See* ECF No. 52. The parties submitted a joint status report indicating the Locus Focus

---

[3] CBAM also included claims for promissory estoppel and tortious interference, but the claims were dismissed pursuant to stipulation of the parties. *See* ECF No. 51.

ORDER **-** 6

data had been provided as well. *See* ECF No. 57. CBAM has not submitted any declarations indicating that replacement-hauler communications are outstanding. As such, the previously reserved portions of CBAM's Motion for Discovery Sanctions are denied as moot.

### III. MOTIONS FOR SUMMARY JUDGMENT

At the June 27, 2017 hearing, the Court addressed Del Monte's Motion for Summary Judgment, ECF No. 20, as well as CBAM's Motion for Partial Summary Judgment, ECF No. 25. The Court denied both parties' motions as to the breach of contract claims but reserved ruling on CBAM's CPA claim. *See* ECF No. 51. On July 17, 2017, the Court held a telephonic hearing, during which the Court granted summary judgment in favor of Del Monte as to the WA CPA claim. *See* ECF No. 59. Below, the Court summarizes its reasoning and memorializes its rulings.

**A. Summary Judgment Standard**

Summary judgment is appropriate only if the record establishes "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of providing the basis for its motion and must identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The substantive law identifies which facts are material, and only disputes over facts that might affect the outcome under the governing law will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

ORDER ~ 7

When deciding whether to enter summary judgment, the Court makes no credibility determinations and does not weigh conflicting evidence. Instead, it must construe the evidence — and draw all reasonable inferences therefrom — in the light most favorable to the nonmoving party. *See Liberty Lobby*, 477 U.S. at 255; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). Still, evidence presented by the parties must be admissible, Fed. R. Civ. P. 56(e)(1), and conclusory or speculative statements are insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**B. CBAM's First Claim and Del Monte's First Counterclaim: Breach of Contract**

CBAM asks for a finding that Del Monte is liable for breach of contract. CBAM contends that the Contract includes an express warranty of quality because the Vegetable By-Product it hauled in 2012 was meant to be a sample. ECF No. 25 at 5. CBAM argues that Del Monte mixed wastewater with the Vegetable By-Product, "effectively failing to deliver the promised goods," and that this "frustrated the purpose of the Contract and impeded CBAM's ability to perform or enjoy its fruits." ECF No. 25 at 4, 10.

Del Monte similarly sought a ruling from the Court that CBAM was in material breach of the Contract and that Del Monte was therefore justified in terminating the Contract. ECF No. 20 at 3-4. Del Monte argues that it never provided a "sample" to CBAM. ECF No. 35 at 7. According to Del Monte, the Contract is clear that the Vegetable By-

ORDER - 8

Product is being sold "as is, where is," and there were no warranties. ECF No. 35 at 7. Del Monte contends that the silage was "wet" and contained the same amount of free water in 2012 as it did in subsequent years. ECF No. 35 at 8.

The parties presented competing evidence such that summary judgment on either of their contract claims would be improper. For instance, Del Monte introduced evidence that the silage has been treated in the same manner that it has for the past 20 years. ECF No. 43 at 2. However, Brandon Munn gave deposition testimony that the proportion of free water increased markedly after 2012. ECF No. 26-4 at 4 ¶¶ 15, 17. This implies that some aspect of how the processing was accomplished changed. ECF No. 41 at 2 ¶ 1. Also, the Contract required Del Monte to "maintain proper supervision of the water screen at all times when By-Product is being generated in order to keep the screen free from becoming clogged and to keep the moisture to a minimum." ECF No. 23-2 Ex. B at 22. Del Monte presented evidence that it cleaned the screens daily. ECF No. 37 at 3 ¶ 5. However, CBAM introduced evidence that the screens were often clogged and repeatedly complained to Del Monte about the excess water. ECF No. 26-4 at 4 ¶¶ 19–21.

For these reasons, as well as the reasons stated on the record during the June 27, 2017 hearing, the Court found genuine disputes of material fact existed as to the parties' performance under the Contract. The Court therefore denied both parties' summary judgment motions as to the breach of contract claims. *See* ECF No. 51.

/

ORDER – 9

**C. CBAM's Fourth Claim: Violations of the WA CPA**

Both parties moved for summary judgment on CBAM's fourth cause of action, in which CBAM alleges that Del Monte's conduct constituted "unfair and deceptive business practices in violation of the Revised Code of Washington Ch. 19.86." ECF No. 1 at 10. CBAM argues that Del Monte provided samples that did not match the product it delivered, and that the product that was delivered contained added wastewater. ECF No. 25 at 12. Further, CBAM contends that "the reason Del Monte did these things was not ignorance, carelessness, or even to save money in processing the sweet corn . . . but rather, to evade wastewater disposal regulations." ECF No. 25 at 13. Del Monte counters that it has done nothing unfair or deceptive in contracting for the removal of the Vegetable By-Product and that performance under the Contract does not rise to the level of affecting the public interest, as required under the CPA. *See* ECF No. 20 at 17.

The purpose of the Washington CPA is "to protect the public and foster fair and honest competition." *Hangman Ridge*, 719 P.2d at 534. It is not, however, meant to apply to all private contracts and disputes. The CPA "shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest," RCW § 19.86.920. To sue under the CPA, a plaintiff must show that the lawsuit will serve the public interest. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986). Thus, the elements of a CPA claim are "(1) an unfair or deceptive act (2) in trade or commerce (3) that affects the public

ORDER - 10

interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act complained of and the injury suffered." *Trujillo v. Nw. Tr. Servs., Inc.*, 355 P.3d 1100, 1107 (Wash. 2015).

Here, the evidence was clear that the Vegetable By-Product was "wet," but there was no showing that this constituted an unfair or deceptive act. Further, private contractual disputes rarely impact the public interest. *See Hangman Ridge*, 719 P.2d at 538. When analyzing the public interest element for a private dispute, courts consider four factors: "(1) whether the defendant committed the alleged acts in the course of his/her business, (2) whether the defendant advertised to the public in general, (3) whether the defendant actively solicited this particular plaintiff, and (4) whether the plaintiff and defendant have unequal bargaining positions." *Trujillo v. Nw. Tr. Servs., Inc.*, 355 P.3d 1100, 1108 (Wash. 2015).

Even assuming arguendo that Del Monte deceived CBAM by including excess water in its silage, that behavior does not affect the public. Del Monte was acting within the course of its business, but did not advertise to the general public. Del Monte may have actively solicited CBAM, but the parties had relatively equal bargaining positions and CBAM was under no obligation to accept the Contract. In the end, "it is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest," *Hangman Ridge*, 719 P.2d at 538, and there was no indication

that future haulers would suffer the same harm.  After all, the replacement hauler, Mr. Yancey, renegotiated his contract to reflect the current price for wet silage, and any future haulers will be able to negotiate their own prices as well.

CBAM's attempts to show public impact by pointing to feed and environmental regulations are unpersuasive.  At best, CBAM's evidence suggests that Del Monte may have misrepresented the amount of free water that would be in the Vegetable By-Product or that Del Monte allowed a higher water content than was contemplated under the Contract.  CBAM presented no evidence that the excess water rose to such a level that the Vegetable By-Product was "adulterated," nor did CBAM demonstrate a real possibility that Del Monte's actions were violating environmental regulations.  In fact, the Contract requires haulers to use sealed trucks and only sell the Vegetable By-Product as feed for livestock.  As CBAM has noted, dairies are subject to their own water regulations.  Thus, under the terms of the Contract, before any Vegetable By-Product liquid can enter the waters of Washington State, such liquid must have been disposed of by an end-user who is subject to the appropriate regulations.

Even viewing the evidence in the light most favorable to CBAM, there is simply no evidence of an impact on the public interest.  As such, there are no issues of material fact to be decided by a jury, and Del Monte is entitled to summary judgment as a matter of law on this claim.

//

/

ORDER - 12

Accordingly, as set forth above and in the Court's prior rulings, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Discovery Sanctions, **ECF No. 18**, is **GRANTED IN PART, DENIED IN PART, and DENIED AS MOOT IN PART**.
2. Defendant's Motion for Summary Judgment, **ECF No. 20**, is **GRANTED IN PART and DENIED IN PART**.
3. Plaintiff's Motion for Partial Summary Judgment, **ECF No. 25**, is **DENIED**.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this __14th__ day of August 2017.

> s/Edward F. Shea
> EDWARD F. SHEA
> Senior United States District Judge